# United States District Court

_____ SOUTHERN _____ DISTRICT OF _____ FLORIDA _____

UNITED STATES OF AMERICA

V.

## CRIMINAL COMPLAINT

CARLOS GIRALDO HURTADO

**CASE NUMBER:** 00-4144-Vitunac

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __June 15, 2000__ in __Broward__ County, in the __Southern__ District of __Florida__ defendant did, (Track Statutory Language of Offense) knowingly and intentionally possess with intent to distribute, heroin, a Schedule I controlled substance, and did knowingly and intentionally conspire, confederate and agree with others to possess such heroin with intent to distribute.

in violation of Title __21__ United States Code, Sections __841(a)(1) and 846.__

I further state that I am a(n) __Special Agent__ and that this complaint is based on the following facts:

Official Title

Please see attached affidavit.

Continued on the attached and made a part hereof: [x] Yes [ ] No

Signature of Complainant
Special Agent Robert Shinn

Sworn to before me, and subscribed in my presence,

June 17, 2000                                   at    Palm Beach County, Florida
Date                                                  City and State

ANN E. VITUNAC
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer                    Signature of Judicial Officer

## AFFIDAVIT

Before me, the undersigned personally appeared Robert Shinn, who, being duly sworn, deposes and states:

1. I am employed as a Special Agent with the Drug Enforcement Administration (DEA) in Fort Lauderdale, Florida. I have been a Special Agent for approximately three and one half years and am currently assigned to investigate violations of federal narcotics laws. Prior to my employment with the DEA, I was a Police Officer in St. Louis County Missouri for 8 years. During my last two years in St. Louis County I was assigned to a narcotics unit where I conducted narcotics investigations.

2. During my career as a DEA Agent and as a police officer, I have participated in numerous investigations involving violations of narcotics laws, including several of heroin cases. As a result of my experience, I am familiar with the manner and methods used by narcotics traffickers to distribute narcotics.

3. This affidavit is submitted as part of a complaint for CARLOS GIRALDO HURTADO to show probable cause for the federal violations of possession with intent to distribute heroin, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to possess heroin with intent to distribute, in violation of Title 21, United States Code, Section 846.

5. On June 15, 2000, members of the Broward County Domestic Drug Interdiction Unit (DIU) were working in the terminal area of the Fort Lauderdale/Hollywood International Airport. At approximately 6:50 P.M., Detectives Robert Wolfkill and Jose Interian observed a subject, later identified as CARLOS GIRALDO HURTADO, arriving in a Yellow taxi cab. This type of cab is

1

known by DIU detectives to be utilized by a large portion of narcotics traffickers from the Miami, Florida area. As HURTADO exited the cab, DIU detectives observed HURTADO scanning people and vehicles at the "departures" area of the terminal. It appeared to DIU detectives that HURTADO was conducting a surveillance. HURTADO walked into the airport and stood in line at the Spirit Airlines ticket counter.

6. Detective Wolfkill observed HURTADO and noted the following factors consistent with the actions and characteristics of narco-couriers arrested at the Ft. Lauderdale airport within the last year. HURTADO was wearing what appeared to be a "Santeria" beaded necklace. Detective Wolfkill knew from his experience that narco-traffickers of Latin American descent often purchase such beads for protection during transport of controlled substances. In addition HURTADO was wearing a large shirt which was not tucked into his jeans. This is common among body carriers of controlled substances who are trying to conceal bulky packaging of controlled substances. HURTADO was also standing on line for an "outbound" flight to La Guardia (New York City) which is a flight and destination city often used by Colombian Narcotics Organizations. HURTADO located Det. Wolfkill standing by the airline counter and began to stare at Det. Wolfkill for an unusual period of time, as if to analyze Detective Wolfkill's status and actions. At that time, Detective Wolfkill moved so as to display his law enforcement badge and picture id, which was on a lanyard about his neck. HURTADO then became extremely nervous and began fidgeting from his right foot to his left foot, while continually looking at the counter at Detective Wolfkill and then to his rear, which was the street entrance of the departure portion of the terminal. The other parties in the line appeared completely unconcerned with Det Wolfkill's presence.

7. At the ticket counter HURTADO produced a passport, and Det Wolfkill noted that

2

HURTADO's hands were shaking. Wolfkill identified himself as a police officer and asked if he could speak with him. HURTADO replied "Yes." Wolfkill asked how long HURTADO was going to be in New York, and HURTADO replied "Three days." Wolfkill asked if he had family in New York, and HURTADO said "Yes." Det. Wolfkill asked how he purchased his ticket, and HURTADO appeared confused. After HURTADO received his ticket, Det. Wolfkill asked if he could speak with him further, and HURTADO said "Yes." Det. Jose Interian, who speaks Spanish, then approached and identified himself as a police officer by displaying his badge and photo id.

8. Det Interian introduced himself in Spanish and asked where HURTADO was flying. HURTADO answered, "New York." Detective Interian asked where he was staying, and HURTADO replied, "with family in Miami."

9. Det. Interian explained his duties and asked permission to search HURTADO's person and carry-on bag; HURTADO agreed. Detective Interian conducted a pat-down of HURTADO and felt numerous small pellets in a circle around HURTADO's waistline, apparently on the interior of HURTADO's jeans. HURTADO became even more nervous and stated twice, "I've got something." HURTADO was then escorted back to the DIU office and consented to removal of his jeans. Detective Wolfkill then observed a ring of pellets wrapped in white nylon tape around HURTADO's waist, and an additional strand of pellets wrapped in white nylon "medical" tape in HURTADO's underwear, as well as two additional stands of pellets wrapped the same way, inside HURTADO's boots. HURTADO also had a two-way radio clipped on his belt; the interior of the radio contained two small squares of white powder wrapped in clear plastic. Det. Wolfkill field tested one of the suspect pellets, which resulted in a positive indication for heroin, a Schedule I controlled substance.

10. Det. Interian advised HURTADO of his constitutional rights in the Spanish language as

3

per <u>Miranda</u> and received acknowledgment from HURTADO that he (HURTADO) understood his rights. HURTADO then admitted that he was acting as a courier for the transportation of heroin from South Florida to New York City, for further distribution. HURTADO admitted that he was being paid to act as a courier; he admitted he had met another courier who had brought the heroin from Colombia, and he (H URTADO) was going to deliver the heroin to another person in New York.

FURTHER YOUR AFFIANT SAITH NOT.

ROBERT SHINN, Special Agent
DRUG ENFORCEMENT ADMINISTRATION

Subscribed and sworn to
before me this 17th day of June, 2000.

ANN E. VITUNAC
UNITED STATES MAGISTRATE JUDGE

4